**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CHRISTOPHER FABRICANT and MALIKA FABRICANT, <br><br> Plaintiffs, <br><br> v. <br><br> INTAMIN AMUSEMENT RIDES INT. CORP. EST., *et al.*, <br><br> Defendants. | Civil Action No. 19-12900 (GC) (JBD) <br><br> **OPINION** |

**CASTNER, District Judge**

     **THIS MATTER** comes before the Court upon Defendants Six Flags Great Adventure LLC, Intamin Ltd., and Intaride, LLC's Motions for Summary Judgment and Motions to Exclude Plaintiffs Christopher and Malika Fabricant's experts, (*see* ECF Nos. 114, 117, 118, 119), as well as Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 115). The parties all filed responses to the Motions. (*See* ECF Nos. 123-130, 133-36.) On March 31, 2025, the Court held a *Daubert*[1] hearing and oral argument on the Motions. (ECF Nos. 147 & 148.) After careful consideration of the parties' submissions and arguments, and for the reasons set forth below, and other good cause shown, Defendants' Motions to Exclude Plaintiffs' Experts (ECF Nos. 114, 118, 119) are **GRANTED in part** and **DENIED in part**. Defendants' Motions for Summary Judgment

---

[1]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

(ECF Nos. 114[2] & 117) are **GRANTED**.  Plaintiffs' Motion for Partial Summary Judgment (ECF No. 115) is **DENIED**.

## I.  BACKGROUND[3]

### A.  Procedural Background

On April 18, 2019, Plaintiffs filed an initial Complaint in the Superior Court of New Jersey, Law Division, Ocean County, alleging a variety of claims related to Christopher Fabricant's injuries sustained while riding the Kingda Ka rollercoaster at the Six Flags amusement park.  (ECF No. 1 ¶ 1.)  On May 15, 2019, Plaintiffs filed an Amended Complaint.  (*Id.* ¶ 2.)  Six Flags subsequently removed the case to this Court on May 24, 2019.  (*See id.* at 1-4.[4])  On August 13, 2019, Plaintiffs filed a Second Amended Complaint (SAC).[5]  (ECF No. 32.)  The SAC asserted product liability claims for design and manufacturing defect (Count One); failure to warn (Count Two); negligence (Count Three); breach of express and implied warranties (Count Four); and loss of consortium (Count Five).[6]  (*Id.*)

In August 2019, all Defendants moved to dismiss the SAC.  (*See* ECF Nos. 33 & 34.)  The Court granted in part and denied in part Defendants' motions.  (ECF No. 44.)  *See Fabricant v.*

---

[2]    The Court notes that Six Flags filed a consolidated Motion for Summary Judgment and Motion to Exclude Plaintiffs' Experts.  (*See* ECF No. 114.)

[3]    On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party."  *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[4]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[5]    The SAC asserted claims against additional Defendants who have subsequently been dismissed from the case.  (*See* ECF Nos. 41-42, 49.)

[6]    The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

*Intamin Amusement Rides Int. Corp. Est., et al.*, Civ. No. 19-12900, 2020 WL 373348, at *9 (D.N.J. Jan. 23, 2020). Specifically, the Court dismissed the following counts: Count One "to the extent that it alleges manufacturing defects under the New Jersey Products Liability Act, N.J.S.A. § 2A:58C-1 *et seq.*"; Count Four (breach of express and implied warranties) in its entirety; Count Five to the "extent that it alleges Plaintiff Malika Fabricant's loss of consortium, society, and services of her spouse against Defendants" Intamin and Intaride. (ECF No. 44.) The Court also dismissed Plaintiffs' claims for punitive damages. (*Id.*) On January 24, 2024, the parties stipulated to dismiss with prejudice all of Plaintiffs' claims for "economic damages arising from loss of wages, loss of income, loss of future earnings, loss of future earning capacity and loss of household services." (ECF No. 111.)

Plaintiffs maintain two claims against Intamin and Intaride—design defect and failure to warn (Counts One & Two)—and two claims against Six Flags—negligence and loss of consortium (Counts Three & Five).

### B. Facts Relevant to the Summary Judgment Motions[7]

#### 1. The Six Flags Incident

On April 23, 2017, Christopher Fabricant, a 52-year-old pelvic surgeon, was injured while

---

[7] The factual circumstances surrounding this case are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. Regarding Six Flags' Motion for Summary Judgment, Six Flags' Statement of Undisputed Facts is referred to as ECF No. 114-3, Plaintiffs' response is ECF No. 129-3, Plaintiff's Counter-Statement of Undisputed Facts is ECF No. 129-4, and Six Flags' response to Plaintiffs' Counter-Statement of Undisputed Facts is ECF No. 135-1. As to Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs' Statement of Undisputed Facts is referred to as ECF No. 115-2, Intamin's and Intaride's responses to Plaintiff's Statement of Undisputed Facts is ECF No. 127, and Six Flags' response to Plaintiff's Statement of Undisputed Facts is ECF No. 128-1. Regarding Intamin's and Intaride's Motion for Summary Judgment, Intamin's and Intaride's Statement of Undisputed Facts is referred to as ECF No. 117-1, Plaintiff's response to Intamin's and Intaride's Statement of Undisputed Facts is ECF No. 130-3, and Plaintiff's Counter-Statement of Undisputed Facts is ECF No. 130-4.

riding the Kingda Ka rollercoaster at the Six Flags amusement park located in Jackson, New Jersey.[8]  (ECF No. 114-3 ¶ 9; ECF No. 129-3 ¶ 9; ECF No. 117-1 ¶¶ 1, 15; ECF No. 130-3 ¶¶ 1, 15; ECF No. 115-4 at 32.)  Kingda Ka was an "accelerator" rollercoaster.  (ECF No. 115-2 ¶ 4.)  The ride reached a speed of approximately 128 miles per hour in about 3.5 seconds.[9]  (*Id.*)

On the day he was injured, Fabricant was at Six Flags with his son and his son's friend.  (ECF No. 117-1 ¶ 15.)  After walking around the park, Fabricant and his son went to ride Kingda Ka where there was "a chaotic push toward the entry way," and subsequently waited in line for approximately 10-15 minutes.  (ECF No. 117-1 ¶ 15; ECF No. 130-3 ¶ 15.)  While waiting in line to board Kingda Ka, Fabricant read one overhead sign that provided instructions on how to safely ride the rollercoaster.  (ECF No. 114-3 ¶ 73; ECF No. 129-3 ¶ 73; ECF No. 117-1 ¶ 18; ECF No. 130-3 ¶ 18.)  Fabricant also received verbal instructions from a recorded message played before each launch on how to safely ride Kingda Ka, including that riders should "hold the harness[,] put your head back, [and] sit up straight."  (ECF No. 114-14 at 99; *see* ECF No. 114-3 ¶ 74; ECF No. 129-3 ¶ 74; ECF No. 117-1 ¶ 19; ECF No. 130-3 ¶ 19.)  Fabricant further received a map of the park, which contained the following language:

---

[8]    Defendants' Object to Plaintiffs' Undisputed Statement of Material Facts, asserting that Plaintiffs' have failed to comply with Local Civil Rule 56.1.  (ECF Nos. 115-2, 127, 128-1.)  The Court agrees and will disregard any statements that are legal conclusions, factual assertions unsupported by the record, and legal conclusions presented under the guise of factual disputes.  *See Sprint Spectrum L.P. v. Zoning Bd. of Adjustment of Borough of Paramus, N.J.*, Civ. No. 09-4940, 2010 WL 4868218, at *18 (D.N.J. Nov. 22, 2010) (noting that courts do not "consider bona fide arguments advanced in a statement of facts, as the purpose of these statements is to narrow the issues before the Court, L. Civ. R. 56.1, comment 2, and arguments inserted therein accomplish the opposite"); *Globespanvirata, Inc. v. Tx. Instruments, Inc.*, Civ. No. 03-2854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005) (noting that legal arguments should not be in Rule 56.1 statements).

[9]    As of 2025, the Kingda Ka rollercoaster is no longer in operation.  (*See* ECF No. 139.)

> Safety is our number one priority.  Guests with certain height, weight and/or body proportions may not be able to participate on certain rides if the safety restraints will not operate as designed. Specific ride information is available at the ride and at Ride Information Center. Test seats are available at the entrance of certain rides.

> [ECF No. 115-2 ¶ 15; ECF No. 127 ¶ 15; ECF No. 128-1 ¶ 15.)]

As part of Six Flags' safety measures, individuals seeking to ride Kingda Ka had the option to sit in a test seat prior to going on the rollercoaster.  (ECF No. 117-1 ¶ 16; 130-3 ¶ 16.)  Fabricant did not utilize, or even see, the test seat prior to riding Kingda Ka.  (ECF No. 114-3 ¶ 72; ECF No. 129-3 ¶ 72; ECF No. 117-1 ¶ 17; ECF No. 130-3 ¶ 17.)

After waiting in line, Fabricant and his son proceeded to select seats near the rear of the train.  (ECF No. 117-1 ¶ 22; ECF No. 130-3 ¶ 22.)  After initially boarding Kingda Ka and lowering the restraint/harness over his head, Fabricant gestured to a ride attendant, by raising his hand, that the restraint/harness was too tight.  (ECF No. 114-3 ¶ 76; ECF No. 129-3 ¶ 76; 117-1 ¶ 23; ECF No. 130-3 ¶ 23.)  One of the attendants subsequently loosened the restraint/harness for all riders, which allowed the riders to lower their restraints/harnesses again prior to the rollercoaster launching.  (ECF No. 114-3 ¶ 77; ECF No. 129-3 ¶ 77; ECF No. 117-1 ¶ 24; ECF No. 130-3 ¶ 24.)  Fabricant put his head and "at least the lower part of" his "occiput"[10] against the back of the seat; he had no concerns as to whether he could safely ride the rollercoaster.  (ECF No. 114-3 ¶ 75; ECF No. 129-3 ¶ 75; ECF No. 117-1 ¶ 25; ECF No. 130-3 ¶ 25.)

Once the rollercoaster launched, Fabricant felt the restraint/harness against the top of his shoulders lock tighter as the ride progressed.  (ECF No. 115-2 ¶ 4; ECF No. 117-1 ¶ 26; ECF No. 130-3 ¶ 26.)  During the ride, Fabricant felt "excruciating, unbearable pain in his shoulders" and

---

[10]    The term "occiput" refers to "the back part of the skull." *Occiput*, Webster's Third New Int'l Dictionary, Unabridged (1993).

pain "so unbearable that seconds seemed endless." (ECF No. 114-3 ¶ 10-11; ECF No. 129-3 ¶ 10-11; ECF No. 117-1 ¶ 27; ECF No. 130-3 ¶ 27.) After riding the rollercoaster, Fabricant had bruising on his right shoulder. (ECF No. 114-3 ¶ 12; ECF No. 129-3 ¶ 12.) Fabricant admits that he did not report any injuries to Six Flags' attendants, visit the park's first-aid station, or visit guest relations about his injuries on April 23, 2017, because he "didn't know that [he] was injured," even though he "knew [he] had pain." (ECF No. 114-14 at 150; *see* ECF No. 114-3 ¶ 13; ECF No. 129-3 ¶ 13; ECF No. 117-1 ¶ 28; ECF No. 130-3 ¶ 28.)

## 2. *Plaintiff Christopher Fabricant's Injuries*

Approximately ten days after riding Kingda Ka, Fabricant obtained a medical consultation with Dr. Brian Halpern for neck and back pain. (ECF No. 114-16; ECF No. 114-3 ¶ 15; ECF No. 129-3 ¶ 15; ECF No. 117-1 ¶ 29; ECF No. 130-3 ¶ 29.) A few days later, Fabricant had a follow-up appointment with Dr. Halpern, who opined that Fabricant's ongoing symptoms resulted from his ride on Kingda Ka. (ECF No. 114-16; ECF No. 114-3 ¶ 16; ECF No. 129-3 ¶ 16.) Around twenty days after riding Kingda Ka, Fabricant visited Jersey Shore University Medical Center to report that he was injured while recently riding a rollercoaster. Fabricant's treatment records indicate he "had [a] roller coaster injury." (ECF No. 114-17; ECF No. 114-3 ¶ 17; ECF No. 129-3 ¶ 17.) The following day, Fabricant was urgently admitted to the hospital where Dr. Todd Albert performed a spinal decompression and fusion surgery. (ECF No. 114-18; ECF No. 114-3 ¶ 17; ECF No. 129-3 ¶ 17; ECF No. 129-4 ¶ 3; ECF No. 135-1 ¶ 3.) On June 5, 2019, Fabricant had a second surgery. (ECF No. 129-4 ¶ 5; ECF No. 135-1 ¶ 5; ECF No. 117-1 ¶ 31.) Ultimately, Fabricant asserts that as a result of a single ride on Kingda Ka, he ruptured two intervertebral discs in his cervical spine, which resulted in three surgeries. (ECF No. 117-1 ¶¶ 30-31; ECF No. 130-3 ¶¶ 30-31.) Fabricant's physicians—Dr. Halpern and Dr. Albert—have opined that as a direct result

of riding Kingda Ka on April 23, 2017, Fabricant is permanently disabled and unable to work as a surgeon.  (ECF No. 115-2 ¶ 6; ECF No. 127 ¶ 6; ECF No. 128-1 ¶ 6.)

The parties dispute the extent of Fabricant's injuries, the cause of the injuries, the necessity of the surgeries, and the conclusions of the medical experts.  (*See* ECF No. 135-1 ¶¶ 2-5; ECF No. 135-1 ¶¶ 2-5; *see also* ECF Nos. 127 & 128-1.)

### 3.  *Fabricant's Return to Six Flags*

Approximately two months after he was injured, Fabricant requested that his attorney in an unrelated matter provide recommendations for personal injury attorneys so that he "could pursue appropriate legal action."  (ECF No. 114-14 at 153-54; *see* ECF No. 114-3 ¶ 20; ECF No. 129-3 ¶ 20.)  In July or August of 2017, Plaintiff consulted with counsel to discuss the Six Flags incident and his ability to pursue legal action.  (ECF No. 114-3 ¶ 21; ECF No. 129-3 ¶ 21.)  At the instruction of his attorney, Fabricant returned to Six Flags in the fall of 2017 or 2018 and took photographs of warning signs posted throughout the park.  (ECF No. 114-3 ¶¶ 24-25; ECF No. 129-3 ¶¶ 24-25; ECF No. 117-1 ¶ 32; ECF No. 130-3 ¶ 32.)  During his deposition, Fabricant testified that on the day he was injured, he had walked around the park and observed and read various signs but did not recall which signs he observed or read that day.  (ECF No. 114-3 ¶ 71; ECF No. 129-3 ¶ 71; ECF No. 114-14 at 82-84, 88-89.)  Fabricant also testified that he had no idea that warning signs were present or that he was required to report his injuries to Six Flags.  (ECF No. 114-14 at 162; ECF No. 129-3 ¶ 25; ECF No. 135-1 ¶ 6.)  According to Fabricant, he believed he had two years to file suit for injuries sustained while riding Kingda Ka.  (ECF No. 114-14 at 163.)

Fabricant again returned to Six Flags in April of 2019—approximately two years after the incident—to gather additional information for his then lawyer.  (ECF No. 114-3 ¶ 26; ECF No.

129-3 ¶ 26; ECF No. 117-1 ¶ 33; ECF No. 130-3 ¶ 33.)  Specifically, Fabricant went to Six Flags to obtain information about signage and notices present at Six Flags, including notices that riders must report any injury within 90 days from the date of an incident.[11]  (*Id.*)  Fabricant took multiple photographs and videos of the various 90-day reporting requirement signs posted throughout the park.  (ECF No. 114-3 ¶ 27; ECF No. 129-3 ¶ 27; ECF No. 117-1 ¶ 34; ECF No. 130-3 ¶ 34.)  However, Fabricant indicated that the "signs require a guest to stand directly in front of them to read them."  (ECF No. 114-13 at 10; ECF No. 129-3 ¶ 27; *see* ECF No. 114-15 at 113 (Fabricant testifying that a person can read the sign "if you're directly beside" it).)

Additionally, while at the park, Fabricant's son took a picture of Fabricant sitting in the Kingda Ka test seat.  (ECF No. 114-3 ¶ 78; ECF No. 129-3 ¶ 78; ECF No. 117-1 ¶ 34; ECF No. 130-3 ¶ 34.)  Fabricant testified that the photograph his son took reflected his recollection of "what the Kingda Ka seat that [he was] seated in during [his] ride on April 23rd, 2017 looked like."  (ECF No. 117-1 ¶ 35; ECF No. 130-3 ¶ 35.)  However, the test seat did not have the same locking mechanism as the seats on Kingda Ka.  (ECF No. 114-3 ¶ 79; ECF No. 129-3 ¶ 79.)  Additionally, Fabricant testified that he could not recall what he was wearing on the date of the incident.  (ECF No. 114-3 ¶ 79; ECF No. 129-3 ¶ 79.)

Fabricant also visited the first aid station and told a Six Flags employee that he wanted to file a report related to the injuries he sustained on Kingda Ka in April 2017.  (ECF No. 114-3 ¶ 28; ECF No. 129-3 ¶ 28.)  During his deposition, Fabricant testified that the employee would not take an incident report because the incident had not occurred that day; rather, the employee told

---

[11]    Pursuant to N.J. Stat. Ann. § 5:3-57(a), "[a]s a precondition to bringing any suit in connection with an injury against an amusement park operator, a rider shall report in writing to the amusement park operator all the details of any accident within 90 days from the time of the incident giving rise to the suit."

Fabricant to mail in a report.  (ECF No. 114-15 at 127; *see* ECF No. 114-3 ¶ 29; ECF No. 129-3 ¶ 29.)  Fabricant did not send an incident report as recommended by the Six Flags employee.  (ECF No. 114-15 at 127-28; *see* ECF No. 114-3 ¶ 29; ECF No. 129-3 ¶ 29; ECF No. 129-4 ¶ 1; ECF No. 135-1 ¶ 1.)  The parties do not dispute that Fabricant failed to provide any notice to Six Flags about the April 23, 2017 incident and subsequent injuries until April 2019 at the earliest when this action was filed.  (ECF No. 114-3 ¶¶ 30-31; ECF No. 129-3 ¶¶ 30-31.)

### 4. *90-day Injury Reporting Requirement*

Six Flags has six 90-day injury reporting signs located throughout the park.  (ECF No. 114-21 at 16; *see* ECF No. 114-3 ¶ 35; ECF No. 129-3 ¶ 35.)  The signs read as follows:

#### Accident or Injury Reporting Requirement

> In order to bring suit against Six Flags Great Adventure LLC in connection with an injury you must report it in writing, giving all details, within ninety (90) days of the incident giving rise to the suit.
>
> A report shall be made at any of the following locations: Guest Relations (located at the front entrance) or First-Aid (located behind Garden State Grill in the Boardwalk.
>
> [(ECF No. 114-21 at 11-12.)]

Six Flags' 90-day injury reporting signs have remained identical in size, content, and location from at least 2013 through April 2023.  (ECF No. 114-23; *see* ECF No. 114-3 ¶ 36; ECF No. 129-3 ¶ 36.)  On April 21, 2023, a New Jersey Department of Community Affairs (NJDCA)[12] certified ride inspector, Kevin Nolan, confirmed in writing that the 90-day injury reporting signage posted at Six Flags was in "full compliance" with controlling regulations.  (ECF No. 114-25; *see* ECF No. 114-3 ¶ 37; ECF No. 129-3 ¶ 37.)  Six Flags asserts that it has never been found to have

---

[12]     NJDCA is the agency responsible for implementing and enforcing N.J. Stat. Ann. § 5:3-57.

violated the requirements associated with the 90-day injury reporting signage or any inspections mandated under N.J. Stat. Ann. § 5:3-57 *et seq.* or N.J. Admin. Code § 5:14A *et seq.* (ECF No. 114-3 ¶¶ 38-39.) Plaintiffs dispute this assertion, claiming that Six Flags failed to comply with the conspicuity requirement of N.J. Stat. Ann. § 5:3-57(c). (ECF No. 129-3 ¶¶ 38-39.)

### 5. *History of Kingda Ka*

The president of Intamin, Sandor Kernacs, testified at his deposition that Six Flags commissioned his company, which specializes in the design and construction of amusement park rides, to design Kingda Ka for the theme park. (ECF No. 117-1 ¶ 2; ECF No. 130-3 ¶ 2.) Kernacs, who is also an engineer, visited Six Flags, inspected the location of where Kingda Ka would be built, and oversaw the creation of the custom design. (ECF No. 117-1 ¶¶ 4-5; ECF No. 130-3 ¶¶ 4-5.) Kingda Ka subsequently opened to the public in 2005. (ECF No. 117-1 ¶ 3; ECF No. 130-3 ¶ 3.)

Per Kernacs, Intamin custom designs each of its rollercoasters "according to the customer's wishes." (ECF No. 117-1 ¶ 6; ECF No. 130-3 ¶ 6.) Kingda Ka's design utilized a complex restraint system comprising many parts, manufactured by different companies. (ECF No. 117-1 ¶ 7; ECF No. 130-3 ¶ 7.) The parties dispute whether the restraint system on Kingda Ka is unique to that ride or identical to other rollercoasters designed by Intamin. (ECF No. 117-1 ¶¶ 8-9; ECF No. 130-3 ¶¶ 8-9.) Intamin and Intaride assert that the restraint system (1) was explicitly designed for Kingda Ka, (2) includes variations that make it different from other restraint systems, and (3) is not identical to the restraint system on other rollercoasters. (ECF No. 117-1 ¶¶ 8-9.) Plaintiffs claim that the restraints and locking mechanisms on Kingda Ka are standardized based on the opinions of Plaintiffs' experts and Intamin's marketing materials discussing their various types of amusement rides. (ECF No. 130-3 ¶¶ 8-9 (citing ECF No. 130-2 at 71-120 (Plaintiffs' engineering

expert opining that the outward appearance of the seats/restraints/locking mechanisms on Kingda Ka are identical to other rollercoasters and that based on his training and experience, Intamin manufactures seats/restraints/locking mechanisms through the use of a standardized manufacturing process).[13]) The parties also dispute whether the seats in Kingda Ka are custom or identical to those of other rollercoasters designed by Intamin. (ECF No. 117-1 ¶ 10; ECF No. 130-3 ¶ 10.) As stated in his deposition, Kernacs testified that Intamin and Intaride "do not have a standard seat and we do not . . . have a seat that we can put in on any roller coaster. All of them are custom. Sometimes you have major differences, sometimes minor differences but maybe just a few inches in difference." (ECF No. 117-4 at 32.)

Kernacs also testified about the safety components of Kingda Ka. In particular, posted signs warn riders to keep their head against the headrest throughout the duration of the ride. (ECF No. 117-1 ¶ 11; ECF No. 130-3 ¶ 11.) One of these warnings reads, "This Ride May Not Accommodate Guests of a Larger Size. Please Utilize the Test Seat Prior To Waiting in Line." (ECF No. 117-1 ¶ 12; ECF No. 130-3 ¶ 12.)

Prior to opening the ride to the public, Intamin provided Six Flags with operation manuals, which were reviewed several times and approved by the State of New Jersey. (ECF No. 117-1 ¶ 13; ECF No. 130-3 ¶ 13.) Based on instructions created and provided by Intamin, as well as requirements established by the NJDCA pursuant to N.J. Admin Code § 5:14A-2.2, riders between 54 inches (4'6") and 77 inches (6'4") were permitted to ride. (ECF No. 114-3 ¶ 66; 129-3 ¶ 66; *see* ECF No. 117-1 ¶ 21; ECF No. 130-3 ¶ 21.) Fabricant was within the acceptable height range at 6'2" tall. (ECF No. 114-3 ¶¶ 67-68; ECF No. 129-3 ¶¶ 67-68.) During his deposition, Fabricant

---

[13]     Plaintiffs point to other rollercoasters in support of their position but fail to provide this court with the names of those rollercoasters. (*See* ECF No. 130-3 ¶¶ 8-10 (providing responses that include incomplete sentences).)

testified that he "suspected" he "had an independent recollection of the height requirements for Kingda Ka." (ECF No. 117-5 at 81; *see* ECF No. 117-1 ¶ 20; ECF No. 130-3 ¶ 20.)  Additionally, Michael Curran, a ride operation's supervisor for Six Flags, testified at his deposition that he had never seen an individual barred from riding Kingda Ka for being too tall or for having one's head unsupported by the headrest; rather, only individuals that were too short to ride the rollercoaster were prohibited.  (ECF No. 129-4 ¶ 21; ECF No. 135-1 ¶ 21.)

The instructions manual, however, states that "[p]assengers with extreme height or unusually long torso where the top of the headrest only supports the neck are not allowed to ride the ride." (ECF No. 114-3 ¶ 69; ECF No. 129-3 ¶ 69.)  Further, the manual provides that "[p]rior to launch, passengers should be advised in the spiel that they must hold on to the grab bar in front of them with both hands with their back and head in full contact with the seatback and headrest facing forward for the high speed launch," and that "[t]o safely ride this ride, the head of the passengers must be supported by the headrests."  (ECF No. 114-3 ¶ 70; ECF No. 129-3 ¶ 70.)

As of the date of the incident, Six Flags' Standard Operating Procedure (SOP) for Kingda Ka included information concerning the ride's height requirement, language warning that "[p]assengers with extreme height or unusually long torso where the top of the headrest only supports the neck are not allowed to ride the ride," and specific assigned tasks for workers on how to enforce the height requirements and how to check safety restraints.  (ECF No. 114-3 ¶ 71; ECF No. 129-3 ¶ 71.)  The SOP provides that Six Flags employees stationed at Kingda Ka must undergo a series of trainings such as studying the rollercoaster's SOP, being visually observed by supervisors while performing their respective job duties, and taking and passing written tests on the rollercoaster's operation and policies.  (ECF No. 114-3 ¶ 72; ECF No. 129-3 ¶ 72.)  Upon completion of their Kingda Ka training, employees are given a written certification outlining their

completion of the ride training and their understanding of ride policies. (ECF No. 114-3 ¶ 73; ECF No. 129-3 ¶ 73.)

The SOP also provides that before a rider was permitted on Kingda Ka, his or her height should have been screened and monitored by employees located both at the entrance of the ride and inside of the loading station. (ECF No. 114-3 ¶ 74; ECF No. 129-3 ¶ 74.) Employees certified to work as loading attendants for Kingda Ka were to be trained on how to perform the loading process, including, but not limited to, checking to ensure the ride restraints were in the correct position before the ride launches. (ECF No. 114-3 ¶ 70; ECF No. 129-3 ¶ 70.[14]) Kernacs testified that he visited Six Flags after Kingda Ka was operational and witnessed employees enforcing Intamin's requirements for safe ride operation. (ECF No. 117-1 ¶ 14; ECF No. 130-3 ¶ 14.) Further, Curran, a ride operation supervisor, provided testimony during his deposition that he assisted in teaching employees assigned to Kingda Ka. (ECF No. 114-31 at 6.)

### C. Facts Relevant to Defendants' Motions to Exclude Plaintiffs' Experts

Defendants challenge the admissibility of three of Plaintiffs' experts: (1) Dr. Robert Sugarman (human factors expert); (2) Edward Pribonic (engineering expert); and (3) Colonel John Smith (design defects expert). (*See* ECF Nos. 114, 118-19.)

#### 1. *Dr. Robert Sugarman*

Plaintiffs retained Robert Sugarman, PhD, PE,[15] a human factors expert, to opine on the 90-day injury reporting requirement signs located at Six Flags. (ECF No. 114-21; ECF No. 114-

---

[14]    Paragraph numbers starting at page 25 of ECF No. 114-3 fail to continue in sequential order. Plaintiffs' response to Six Flags' Statement of Undisputed Facts appears to acknowledge this issue. (*See* ECF No. 129-3 at 19.)

[15]    Dr. Sugarman holds a doctorate in experimental psychology from the University of Buffalo. (ECF No. 114-21 at 2.) Dr. Sugarman also holds a Bachelor of Arts degree in physics; he has a certificate in engineering and is a licensed engineer in California. (*Id.*; ECF No. 114-22

22.) Dr. Sugarman opines that Six Flags' signs were not in compliance with N.J. Stat Ann. § 5:3-57, which requires that the signs be placed *conspicuously* in at least five different locations throughout the park. (ECF No. 114-21 at 16.) Dr. Sugarman's opinion is based on general and specific conspicuity factors and the ANSI Z535.2 standard (standards for safety sign formatting).[16] (*Id.* at 13-15.)

According to Dr. Sugarman, general conspicuity factors are those "shared by each of the six Reporting Requirements signs," while specific factors are those "related to the specific location where each of the six signs was posted." (*Id.* at 13-14.) Dr. Sugarman explains that general conspicuity factors include "the nature of the park itself" and "comprehension." (*Id.*) As to the nature of the park, Dr. Sugarman opines that because "it is unlikely that a patron will enter the Park believing there is any more than a small 'everyday' risk that he will be hurt," the signs "need[] to be conspicuous, compared to other attention-getting objects in the environment, and easy to recall at a later time." (*Id.*) Regarding comprehension, Dr. Sugarman opines that the signs are written for a college graduate. (*Id.* at 14.) Dr. Sugarman also relies on the standards outlined in ANSI Z535.2[17] when discussing the general conspicuity factors:

---

at 38-39.) He has previously been qualified as a human factors expert in federal and state courts in New Jersey in approximately twelve different cases. (*See* ECF No.114-22 at 48, 51-54; *see also* ECF No. 114-21 at 3.) Notwithstanding Dr. Sugarman's work in New Jersey, he has also testified as a human factors expert in a trial in New Mexico related to a bungee ride at an amusement park that did not have specific signage and warnings concerning the ride. (*See* ECF No.114-22 at 49-50.)

[16] In his report, Dr. Sugarman also cites to the treatise, "What is a Warning and When Will it Work?" and the Flesch Reading Ease and the Flesch-Kincaid tests. (ECF No. 114-22 at 11-13.) However, during his deposition, Dr. Sugarman testified that he did not rely on or use these sources in formulating his opinions. (ECF No. 114-21 at 14; ECF No. 114-22 at 13.) Therefore, the Court will not address these sources here.

[17] During his deposition, Dr. Sugarman recognized that ANSI Z535.2 is not codified in the applicable New Jersey amusement park statute or regulations but has been codified in the

[(1)] The lettering size [on the 90-day reporting signs] would limit a patron to about 5 feet for a viewing distance (under unfavorable viewing conditions); [(2)] [t]he font characteristics make it difficult to read (poor legibility), having uneven stroke widths and stroke widths that are too large compared to the character height and width; [(3)] [t]he low brightness contrast of the gray lettering on a pale yellow background further decreases the legibility and maximum viewing distance for the words (especially under poor viewing conditions); [(4)] [t]here are no attention-getting alerting words, such as NOTICE, or pictograms, that indicate the importance of the sign's message; [(5)] [t]he size of the sign is adequate in most settings (if all other factors are adequate), except is dwarfed by other, much larger signs at the East Entrance; [(6)] [t]here are no contrasting colors as one sees in the other colorful signs in the environment (cf., Entrance east side, Guest Relations (outside and inside).

[(*Id.* at 14-15.)]

Dr. Sugarman also opines that "more than half of the sign is written in Spanish which would be of no interest or attraction to an English-only speaker." (*Id.* at 15.) Based on his discussion of several general factors, Dr. Sugarman concludes that "[t]hese factors alone are enough to determine that the sign will be inconspicuous unless it is 'in your face' by virtue of its location." (*Id.*)

As to the specific factors, Dr. Sugarman opines that such factors are based on "the position of each individual sign." (*Id.*) He provides several problems or observations with the various locations of the signs, including: (1) the east entrance sign is "embedded among much more conspicuous signage and potentially too far away from many patrons who are entering at this location" and "[m]ost entering patrons are diverted to the west side of the entrance plaza ensuring that they would not read this sign"; (2) the west entrance sign "is outside the useful field of view of patrons exiting the park and looking ahead toward the parking lot" and "would require an overt

---

Occupational Safety and Health Act. (ECF No. 114-22 at 20-21, 31-33, 36-37.) He further testified that ANSI Z535.2 is not specific to amusement parks or injury reporting signs. (*Id.* at 21-24.) Based on Dr. Sugarman's testimony, the ANSI Z535 standards are voluntary. (*Id.* at 21-22.)

act, climbing onto a low brick-walled area to get into position to read, if noticed"; (3) the sign near guest relations "has no pedestrian traffic when this auxiliary gate is closed"; (4) the sign inside guest relations is a "well-trafficked location for a portion of patrons, but [has] many distractions"; (5) the sign near the exit turnstiles is a "well-trafficked location for a portion of patrons, but who, if in distress, are not likely to notice the relevance of the low-conspicuity sign" and "[t]he sign is to the far left of the row of turnstiles, [and] unlikely to be seen at the right end of the exit area"; and (6) the first aid station sign is a "well-placed sign for those seeking immediate medical attention," but "is 'off the beaten track', away from any attractions, and not at all likely to be seen by typical patrons." (*Id.* at 15.)

After considering these general and specific factors, Dr. Sugarman opines that even though the six injury reporting signs at Six Flags "are placed in the mandated locations and may be noticeable (i.e., can be seen) by a patron who is within several feet of the sign, with the possible exception of the First Aid Station sign which will only be seen by patrons seeking out this remote location," the signs "do not have the 'conspicuity' attributes that would make them notable, and attention-getting (i.e., 'conspicuous')." (*Id.* at 16.) As a result, Dr. Sugarman concludes "to a reasonable degree of human factors engineering certainty, that the Six Flags Great Adventure Amusement Park has failed to comply with the requirements of N.J. Stat. 5:3-57(c)," which requires "the Park to 'conspicuously post[] notice of the reporting requirement . . . in at least five different locations on the premises, including each entrance and exit, each place designated for receiving reports of accidents and injuries during business hours and each place designated as a first aid station.'" (*Id.*)

During his deposition, Dr. Sugarman was also shown an email from NJDCA regarding Six Flags' compliance with the signage requirements. Dr. Sugarman testified that he had never seen

the email before.  (ECF No. 114-22 at 33-34.)  He further acknowledged that there was no evidence that NJDCA failed to complete a mandated inspection at Six Flags as required by controlling regulations or that there was any evidence or documents indicating that Six Flags was ever issued a violation or failed to pass an inspection performed by NJDCA in relation to the 90-day injury reporting signs.  (*Id.* at 29-30, 34.)  Dr. Sugarman stated that he saw no evidence that NJDCA, a certified ride inspector, or third-party inspector ever determined that Six Flags' 90-day injury reporting signs were deficient.[18]  (*Id.*)

### 2.   Edward Pribonic

Plaintiffs retained Edward Pribonic, PE,[19] to "conduct an engineering review and mechanical analysis to determine the mechanisms by which Fabricant received the injuries to his spine, as the result of riding on the Kingda Ka roller coaster," and if necessary opine on "the kinematics or movements that created the injury mechanisms."  (ECF No. 114-27 at 8.)  Pribonic was also "asked to identify those factors that contributed to or enhanced those injury mechanisms." (*Id.*[20])

---

[18]    The Court notes that Dr. Sugarman's testimony during the *Daubert* hearing was consistent with his testimony during his deposition.

[19]    Pribonic holds a Bachelor of Mechanical Engineering degree from the University of Pittsburgh; he is a registered professional engineer and is licensed in California.  (ECF No. 114-27.)  He specializes in "engineering design, rehabilitation, safety improvement, maintenance, ride safety inspections and accident investigation in the amusement ride industry."  (*Id.*)  Pribonic has held engineering related positions at Walt Disney Imagineering and Disneyland, has provided consultation to theme parks and ride manufacturers pertaining to ride equipment design, and has taught ride safety and inspection courses to California ride inspectors and to industry members. (*Id.*)  He has previously been qualified as an expert in the field of engineering in approximately twenty cases in both state and federal court in New Jersey.  (*Id.*)

[20]    All Defendants have moved to exclude Pribonic, but for ease of reference, the Court will only cite to Six Flags' exhibits.  (*See* ECF Nos. 114-26 & 114-27.)

In his report, Pribonic opines that: (1) "Christopher Fabricant did not meet the rider height requirements for Kingda Ka"; (2) the design of the seats and restraints resulted in "[e]xcessive [n]eck [m]ovement and [i]nsufficient clearance between restraint and rider"; and (3) Defendants Intamin and Intaride failed "to comply with design and testing standards." (ECF No. 114-27 at 12, 15.) As to his assertion on Fabricant's height, Pribonic concludes that "Dr. Fabricant should not have been permitted on the ride and would not have been subsequently injured had he been turned away as the ride regulations require." (*Id.* at 12.)

Pribonic's opinions are premised upon: (1) Fabricant's head being forcefully moved back because of inadequate restraints behind his head and neck and the high acceleration forces of Kingda Ka; (2) Fabricant's restraint was not placed on him properly given his size; (3) the ride attendants did not understand the necessary position for the restraint or did not see his height in comparison to the seat back height; (4) the ride attendants were inadequately trained because they failed to evaluate Fabricant's height and head position, or failed to observe that the lap bar was not seated against his legs; (5) Intamin failed to perform the required analyses for the seats and restraints as required by New Jersey Administrative Code and ASTM standards, which "render[ed] the seats and restraints unreasonably dangerous and defective"; and (6) "Kingda Ka seats are defective, by not being able to accommodate taller passengers, (up to 77" height), against the forces exerted by the ride." (*Id.* at 19-21.)

In addition to Pribonic's report, Pribonic also provided a July 15, 2019 declaration opining that the seats and restraints on Kingda Ka were standardized and mass-produced. (ECF No. 130-

2 at 71-93.)  In support of his opinion, Pribonic attached photographs from the internet[21] of other rollercoasters from around the world.

> Despite the fact that the seats, restraints, and locking mechanisms shown in [the exhibits] are installed on roller coasters located, in some cases, thousands of miles away from each other, and from the Kingda Ka roller coaster in the Six Flags Great Adventure Amusement Park[, and] aside from possible cosmetic differences (color, shading, etc.), at least from outward appearances, I am unable to observe any physical difference in the functionality, exterior design or dimensions of the seats[,] . . . design and dimensions of the restraints[,] . . . or design and dimension of the locking mechanisms . . . shown in the photographs attached hereto, as compared [with] those seats, restraints, and locking mechanisms on the Kingda Ka roller coaster.
>
> [*Id.* at 74.)]

Further, Pribonic opines that despite the attached exhibits only showing exteriors of the seats, restraints, and locking mechanisms, "it is noteworthy that, in addition to the virtually identical appearance of their exterior designs, there are also structural bolts visible in several of these photographs . . . that are located in positions identical to the positions of the similar structural bolts visible in the photographs of the seats, restraints, and locking mechanisms of the Kingda Ka roller coaster."  (*Id.*)

Pribonic concludes that the "outward appearance[] [of] the seats, restraints, and locking mechanisms" shown in the exhibits "appear to be identical in functionality, design, and in their structural components."  (*Id.*)  Further, Pribonic concludes that in his more than forty years as a licensed mechanical engineer, "I can attest that products manufactured by the same manufacturer for the same purpose, displaying the type of overall identity of design, dimensions, and structural components like that shown in the Intamin roller coaster seats, restraints, and locking mechanisms

---

[21]    Pribonic's declaration provides the web addresses (*i.e.*, URLs) where he located the photographs.  (*See* ECF No. 130-2 at 73.)

depicted in the [exhibits]," are "manufactured through the use of a standardized manufacturing process using standardized machinery, standardized product design, standardized materials, standardized component parts, and standardized factory quality control protocols." (*Id.* at 74-75.)

### 3. Colonel John Smith

Plaintiffs retained Colonel John Smith, P.E., a former engineer for the United States Army Corps of Engineers, as a biomechanical causation expert. (ECF No. 119-3.)  In his report, Colonel Smith opines that because Fabricant's head was not fully supported by the seat, his "head obeyed Newton's First Law of Motion," resulting in an extension and bending of his neck.  (*Id.* at 10.) Newton's First Law of Motion "effectively states an object at rest remains at rest unless acted upon by an outside force and an object in motion remains in motion unless acted upon by an outside force." (*Id.*)  Colonel Smith also concluded that "[a]s a result of the lack of support to his head, Dr. Fabricant was subjected to forces much more severe than those normally encountered" on the ride and that "the severity of the event was aggravated by the motion of the ride after the initial" extension and bending of the head/neck "as cars went around the curves." (*Id.* at 11.)  Further, Colonel Smith concluded that based on Kernacs's deposition testimony, Intamin and Intaride did not properly evaluate the safety of Kingda Ka in terms of biomechanics because "[i]t should have been obvious to anyone with the proper background that the entire head need[ed] to be supported under the rapid acceleration" of the rollercoaster.  (*Id.*)

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if it

could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))). "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

### B. Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;

     (c)  the testimony is the product of reliable principles and methods; and

     (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

[Fed. R. Evid. 702.]

Under Rule 702, "[d]istrict courts are tasked with a 'rigorous gatekeeping function,'" to ensure that expert testimony is both relevant and reliable. *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000)). Notwithstanding, "Rule 702 . . . has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). Expert testimony will be admissible if: (1) "the expert is qualified"; (2) "the proposed testimony is reliable and concerns matters requiring scientific, technical, or specialized knowledge"; and (3) "the expert's testimony is 'sufficiently tied to the facts of the case,' . . . so that it 'fit[s]' the dispute and 'will assist the trier of fact[.]'" *Cohen*, 125 F.4th at 460 (quoting *Daubert*, 509 U.S. at 591). The party proposing the expert testimony must show that each prong is satisfied by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

Importantly, the "gatekeeping function is necessarily 'flexible,' . . . granting district courts 'latitude in deciding how' these requirements are met." *Cohen*, 125 F.4th at 460 (first quoting *Daubert*, 509 U.S. at 594, and then quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "Such 'discretionary authority' permits a district court to 'decide whether or when special briefing or other proceedings are needed to investigate reliability.'" *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152). As part of this discretionary authority, a district court must decide in each case whether a *Daubert* hearing is appropriate. Courts in the Third Circuit have recognized, that "[a] district] court is not required to hold a *Daubert* hearing, even if it is requested, if the record allows

the court to rule on admissibility." *United States v. Xue*, 597 F. Supp. 3d 759, 770 (E.D. Pa. 2022). Indeed, a "hearing will obviously not be required whenever a *Daubert* objection is raised to a proffer of expert evidence. Whether to hold one rests in the sound discretion of the district court." *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). "A hearing is especially not necessary where a court 'already ha[s] before it the depositions and affidavits of the [proposed] experts.'" *Xue*, 597 F. Supp. 3d at 771 (quoting *Oddi*, 234 F.3d at 154). However, as the Third Circuit has also recognized:

> The adversarial process upon which our legal system is based assumes that a fact finder will give the parties an adequate opportunity to be heard; if it does not, it cannot find facts reliably. Thus, the detailed factual record requirement, firmly entrenched in our jurisprudence, requires adequate process at the evidentiary stage, particularly when a summary judgment may flow from it.
>
> [*In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 854 (3d Cir. 1990).]

When a case, such as the instant matter, hinges at least in part on the admissibility of Plaintiffs' experts, the Court must hold a *Daubert* hearing. *See Est. of Borroto v. CFG Health Sys., LLC*, 751 F. Supp. 3d 443, 468 (D.N.J. 2024) ("Although courts are not required to hold a hearing on expert admissibility, a motion for summary judgment should be denied as premature if 'made before [a court] has had the opportunity to hold a *Daubert* hearing and consider the admissibility of Plaintiff's proffered expert testimony.'" (quoting *McConaghy v. Sequa Corp.*, 294 F. Supp. 2d 151, 168 (D.R.I. 2003))); *Qasim v. Spectrum Brands Holdings, Inc.*, Civ. No. 21-18744, 2025 WL 750185, at *3 (D.N.J. Mar. 10, 2025) (noting that "[a] motion for summary judgment should be denied without prejudice pending the outcome of a *Daubert* hearing, when disposition of the motion depends on a determination of the admissibility of expert testimony" (quoting *Martin v. Blaser Swisslube, Inc.*, Civ. No. 03-6116, 2005 WL 3454291, at *7 (D.N.J. Dec. 16, 2005))).

### 1. *Prong One – Qualification*

"Qualification refers to the requirement that the witness possess specialized expertise." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The basis for this specialized expertise "can be practical experience as well as academic training and credentials." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998)). While courts have interpreted the special expertise requirement "liberally," "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741 (quoting *Waldorf*, 142 F.3d at 625). Importantly, however, an expert does not have to "be the best qualified" or "have the specialization that the court considers most appropriate." *Pineda*, 520 F.3d at 244.

### 2. *Prong Two – Reliability*

The "reliability requirement ensures that an expert's testimony is 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" *Cohen*, 125 F.4th at 461-62 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)). "[A]dmissibility does not hinge on 'whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.'" *Id.* at 462 (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999)). Rather, courts look to whether the expert's testimony is supported by "good grounds." *Id.* (quoting *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020)). In conducting this analysis, courts are to consider "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "The court's focus must be on the principles and methods,

rather than on the ultimate conclusions reached." *Milltown-Ford Ave. Redevelopment Agency v. S.B. Bldg. Assocs., L.P.*, Civ. No. 19-21494, 2024 WL 3690776, at *16 (D.N.J. Aug. 7, 2024) (citing *In re Paoli*, 35 F.3d 717, 742 (3d Cir. 1994)). Because, however, "'conclusions and methodology are not entirely distinct from one another,' the court may conduct 'at least a limited review of the expert's conclusions "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used."'" *Id.* (first quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and then quoting *In re Human Tissue*, 582 F. Supp. 2d 644, 656 (D.N.J. 2008)).

As the Third Circuit recently reiterated, "there is no 'definitive checklist or test,'" for courts to employ when analyzing what constitutes "good grounds." *Cohen*, 125 F.4th at 462 (quoting *Daubert*, 509 U.S. at 593). Nevertheless, along with "any other[ factors] that are relevant," courts consistently consider the following factors in determining the reliability of a proposed expert:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.
>
> [*In re Paoli*, 35 F.3d at 742 n.8 (citing *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)).]

*See Cohen*, 125 F.4th at 462 (noting that "some analysis of these factors is necessary" (quoting *UGI Sunbury*, 949 F.3d at 834)).

"Although these factors are neither exhaustive nor applicable in every case, they provide a convenient starting point for analyzing" reliability. *Kannankeril*, 128 F.3d at 806-07. In some cases, the relevant reliability concerns "may focus upon personal knowledge or experience," rather

than "scientific foundations."  *Kumho Tire Co.*, 526 U.S. at 150; *see also Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (explaining that in nonscientific cases, "the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness").

Importantly, "good grounds" do not require that an expert's opinion be perfect.  *Matter of Soued*, 689 F. Supp. 3d 1, 11 (D.N.J. 2023).  "Indeed, 'an expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility.'"  *Id.* (quoting *N.J. Dep't of Env't Prot. v. Amerada Hess Corp.*, Civ. No. 15-6468, 2019 WL 4052431, at *6 (D.N.J. Aug. 28, 2019)).  If good grounds are shown, an expert's testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

### 3.  Prong Three – Fit

"The third prong of admissibility, fit, concerns whether the expert's testimony will be helpful to the trier of fact."  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 132 (D.N.J. 2020) (citing Fed. R. Evid. 702(a)).  The Third Circuit has explained that "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'"  *In re Paoli*, 35 F.3d at 743 (quoting *Downing*, 753 F.2d at 1237).  "Fit is an issue of relevance and simply means that scientific validity of the method or principles applies to the issues at hand."

*Geiss v. Target Corp.*, Civ. No. 09-2208, 2013 WL 4675377, at *5 (D.N.J. Aug. 30, 2013) (citing *United States v. Ford*, 481 F.3d 215, 220 n.6 (3d Cir. 2007)). "Whether an expert's testimony meets the fit requirement 'is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" *In re Johnson & Johnson Talcum Powder Prods. Mktg.*, 509 F. Supp. 3d at 132 (quoting *In re Paoli*, 35 F.3d at 743).

"Distinct from, but related to, Rule 702's requirements is the prohibition under New Jersey law on an expert offering a 'net opinion.'" *Milltown-Ford Ave. Redevelopment Agency*, 2024 WL 3690776, at *17. "Under New Jersey law, an expert's bare conclusions, unsupported by factual evidence are an inadmissible net opinion." *Faragalla v. Otundo*, 626 F. Supp. 3d 783, 786 (D.N.J. 2022) (internal quotations omitted). "The expert's testimony should be excluded 'if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture.'" *Id.* (quoting *Dawson v. Bunker Hill Plaza Assocs.*, 673 A.2d 847 (N.J. Super. App. Div. 1996)). In other words, "an expert is required 'to give the "why and wherefore" of the opinion, rather than a mere conclusion.'" *Id.* at 786-87 (quoting *Curtis v. Besam Grp.*, Civ. No. 05-2807, 2007 WL 3232589, at *7 (D.N.J. Oct. 31, 2007)). A court's inquiry as to net opinions is "whether the expert's opinion will assist the trier of fact." *Id.* at 787.

## III.  **DISCUSSION**

### A.  **Motions to Exclude Plaintiffs' Experts**

Defendants seek to preclude Dr. Sugarman, Edward Pribonic, and Colonel Smith from testifying as experts in this case.[22]  For purposes of ruling on Defendants' Motions for Summary

---

[22]    Six Flags challenges Dr. Sugarman and Edward Pribonic.  Intamin and Intraride challenge Edward Pribonic and Colonel Smith.

Judgment, the Court need only rule on the admissibility of Pribonic's testimony consistent with his July 15, 2019 declaration. (ECF No. 130-2 at 71-93.[23])

In his July 15, 2019 declaration, Pribonic opines that the seats and restraints on Kingda Ka were standardized and mass-produced. (ECF No. 130-2 at 71-93.) After reviewing pictures of the Kingda Ka seats and pictures of other Intamin/Intaride rollercoasters found on the internet, Pribonic concludes that the "outward appearance[] [of] the seats, restraints, and locking mechanisms" shown in the photographs "appear to be identical in functionality, design, and in their structural components" and that he cannot identify any differences in the pictures. (*Id.* at 74.) Further, Pribonic opines that in his more than forty years as a licensed mechanical engineer, "I can attest that products manufactured by the same manufacturer for the same purpose, displaying the type of overall identity of design, dimensions, and structural components like that shown in the Intamin roller coaster seats, restraints, and locking mechanisms depicted in the [photographs]," are "manufactured through the use of a standardized manufacturing process using standardized machinery, standardized product design, standardized materials, standardized component parts, and standardized factory quality control protocols." (*Id.* at 74-75.)

The Court finds that the opinions set forth in Pribonic's July 15, 2019 declaration are inadmissible as they are unreliable and constitute net opinions. Pribonic's findings are not based on any clear methodology, thereby precluding the Court from weighing the eight factors in *In re Paoli*. *See In re Paoli*, 35 F.3d at 742 n.8 (outlining eight factors that courts can use as guidelines for determining reliability); *see also Oddi*, 234 F.3d at 156 (excluding the accident

---

[23]    Because Intamin and Intaride did not challenge Pribonic's qualifications in their written submissions or at the *Daubert* hearing, the Court need not address that prong. (*See* ECF No. 118 at 18.) Nevertheless, the Court finds that Pribonic satisfies the qualification prong given his experience in engineering and in the amusement park industry.

reconstruction/design engineering expert because he did not satisfy any of the eight factors from *In re Paoli*). Indeed, Pribonic's opinions regarding functionality, design, and structure are based solely on a visual comparison of photographs pulled from the internet that purport to be other Intamin and Intaride rollercoasters. Pribonic does not identify the dimensions, designs, or the nature of the materials of the seats, restraints, and/or locking mechanisms in reaching his conclusions.[24] And Pribonic does not identify any testable hypothesis, standard, or technique used to formulate his conclusions. (*See* ECF No. 130-2 at 71-93.)

The Court notes that an expert "may focus upon personal knowledge or experience," rather than "scientific foundations." *Kumho Tire Co.*, 526 U.S. at 150. But even considering Pribonic's experience in the amusement park industry and his time as an engineer, the Court finds that his opinions in the July 15, 2019 declaration fall within the category of "subjective belief and unsupported speculation," *Cohen*, 125 F.4th at 461-62, or a net opinion, *see Riya Dev Corp. v. AmGUARD Ins. Co.*, Civ. No. 22-6415, 2025 WL 900305, at *6 (D.N.J. Mar. 25, 2025) (noting that "[u]nder the net opinion rule, an expert's testimony should be excluded if it appears the witness is not in possession of such facts as will enable him . . . to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture" (cleaned up)). Pribonic did not actually conduct any in-person examination of any of the rollercoasters in the photographs attached to his declaration (including Kingda Ka). Rather, he simply compared photographs of rollercoasters he found on the internet to the Kingda Ka photograph taken by Plaintiffs in this case, as well as another Kinga Ka photograph found on the internet. Moreover, as acknowledged in his declaration, Pribonic's opinion is limited solely to the visual appearances of the exteriors of the

---

[24]    At most, Pribonic provides an unsupported conclusory statement that "there are structural bolts visible in several of these photographs . . . located in positions identical to the positions of . . . similar structural bolts [on] Kingda Ka." (ECF No. 130-2 at 74.)

rollercoasters—not the internal component parts of the seats and rider restraints—because he only reviewed photographs and failed to inspect these rollercoasters in person.  (*See also* ECF No. 136 at 12 n.3 (arguing that the opinions expressed in Pribonic's declaration are inadmissible because "Pribonic has conceded that he has no experience in the production of rollercoaster seats," and "[because] [h]e . . . lacks the requisite knowledge to credibly comment on whether the seats and restraint systems were 'standardized' and used in 'thousands of rides around the world'").

Experts are permitted to offer opinions, "including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592.  But given the technical expertise being offered here, the Court finds that Pribonic's opinion is impermissibly speculative because it is grounded only in his superficial observations of seat exteriors through photographs.  *See Oddi*, 234 F.3d at 158 (finding that the accident reconstruction/design engineering expert opinion was "based on nothing more than his training and years of experience as an engineer" and holding that "there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case"); *Furlan v. Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012), *aff'd*, 516 F. App'x 201 (3d Cir. 2013) (finding that the plaintiffs' expert did not satisfy the reliability prong because "[t]he only 'standard' that guided [the expert's] analysis was his perception, based on an amateur photograph and the fact that an accident occurred").  Moreover, just like the expert in *Oddi*, Pribonic "used little, if any, methodology beyond his own intuition," which, although potentially sufficient in some cases, is not here.  *Id.*; *cf. Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 599 n.7 (3d Cir. 1998) (finding that an expert's "twenty years of experience with track equipment, maintenance, and safety procedures qualified him as an expert who could testify as to Amtrak's responsibility to inspect and maintain the track in a safe

30

condition"); *see also Arlanxeo Canada, Inc. v. Kaydon Ring & Seal, Inc.*, Civ. No. 21-01843, 2025 WL 964258, at *3 (M.D. Pa. Mar. 31, 2025) ("[E]xpert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that 'district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of *Daubert*.'" (quoting *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007))).

Moreover, because Pribonic's declaration is not based on any methodology, but rather his own intuition, and is speculative, the Court also finds that he would not provide helpful testimony to the jury. *See Gonzalez-Lopez v. Perfect Trading, Inc.*, Civ. No. 21-12906, 2024 WL 1406563, at *3 (D.N.J. Apr. 2, 2024) (finding that the expert failed to meet the fit prong because merely providing opinions based on video footage and discovery from the case, without any scientific methodology, is not helpful to the jury). Therefore, Pribonic also fails to meet the fitness prong.

For the foregoing reasons, any testimony as to the opinions set forth in Pribonic's July 15, 2019 declaration fails to meet the *Daubert* standard, and therefore is inadmissible.

### B. Motions for Summary Judgment

Defendants each assert that Plaintiffs' claims are barred by various statutes of limitations. As to Six Flags, it asserts that Plaintiffs failed to comply with the 90-day reporting requirement applicable to injury suits against amusement parks. (ECF No. 114). Separately, Intamin and Intaride assert that New Jersey's statute of repose applies, and therefore bars Plaintiffs' claims against them. (ECF No. 117). The Court agrees that all of Plaintiffs' claims are time-barred.

#### 1. *90-Day Statute of Limitations*

Six Flags asserts that Plaintiffs' claims against it are time barred pursuant to the Carnival-Amusement Rides Safety Act (CARSA), N.J. Stat. Ann. § 5:3-31 *et seq.* (specifically N.J. Stat.

Ann. § 5:3-57), and Carnival-Amusement Rides regulations, N.J. Admin. Code 5:14A-4.12(a). The issue in this case centers around the undefined term "conspicuously" in N.J. Stat. Ann. § 5:3-57. Therefore, in analyzing this issue, the Court must rely upon underlying policy and state court decisions addressing CARSA. *See Montgomery Cnty. Pa. v. MERSCORP Inc.*, 795 F.3d 372, 376 (3d Cir. 2015) ("Where the highest court of a state has interpreted a state statute, [federal courts] apply the interpretation of state law by the state's own courts. [W]hen there is no decision from the state's highest court directly on point, however, [federal courts] are charged with predicting how that court would resolve the question at issue. In doing so, [federal courts] take into consideration any opinions of the state's intermediate courts, as well as [t]he policies underlying applicable legal doctrine, current trends in the law and decisions of other courts.") (cleaned up); *Fink v. Ritner*, 318 F. Supp. 2d 225, 228 (D.N.J. 2004) (noting that in interpreting state statutes, federal courts will consider the legislature's purpose for enacting such statute, as well as how state courts have interpreted and applied the statute at issue).

Enacted in 1975, CARSA, now codified at N.J. Stat. Ann. § 5:3-31 *et seq.*, was "designed to provide greater safety at carnivals and [for] amusement[] rides." Press Release, Office of the Governor of New Jersey, S-1135 – Carnival-Amusement Rides Safety Act (May 29, 1975) (on file with New Jersey State Library). In 1992, following a series of bills introduced by various groups seeking immunity from civil liability stemming from personal injuries, the New Jersey Legislature passed the Amusement Park Safety and Fair Liability Act (APSFLA) as a supplement to CARSA. P.L. 1992, Chapter 118, Assembly No. 917, Third Reprint, at 1 (Oct. 22, 1992) (on file with New Jersey State Library); Letter from James J. Florio, Governor, State of New Jersey – Executive Department, to the General Assembly, at 1 (Sept. 10, 1992) (on file with New Jersey State Library) (Florio Letter). In support of APSFLA, the Legislature found that "[a]musement parks . . . are

32

attended by a large number of citizens [in New Jersey] and also attract to this State a large number of non-residents, significantly contributing to the tourist industry of this State," and that, as a result, "the allocation of the risks and costs of amusement parks is an important matter of public policy." P.L. 1992, Chapter 118, at 1.  Recognizing that "[t]he amusement park operator is already the subject of significant safety obligations and inspection requirements imposed by existing statutes and regulations," the Legislature detailed the purpose of APSFLA as creating an "explicit policy of [New Jersey] which recognizes that amusement rides include risks which must be borne by those who engage in such activities and which are essentially impractical or impossible for the operator to eliminate."  *Id.*  Therefore, the purpose of APSFLA is to "state those risks a rider voluntarily assumes for which there can be no recovery and to establish a code for riders."  *Id.*

Of relevance to the present case, APSFLA created a 90-day window in which individuals must notify an amusement park operator of an injury as a precondition to filing an injury suit.  *Id.* at 4.  The 90-day reporting requirement was "due to the short duration of amusement park season and the difficulty in securing statements from seasonal employees" and "would allow the park operators sufficient opportunity to adequately address any claims which may be asserted by the accident victim."  Florio Letter at 2.

Specifically, the statute provides that "[a]s a precondition to bringing any suit in connection with an injury against an amusement park operator, a rider shall report in writing to the amusement park operator all the details of any accident within 90 days from the time of the incident giving rise to the suit."  N.J. Stat. Ann. § 5:3-57(a).  The statute further provides that the 90-day reporting requirement does not apply unless:

> the operator conspicuously posts notice of the reporting requirement in English and one other language deemed appropriate by the amusement park operator and in at least five different locations on the premises, including each entrance and exit, each place designated for receiving reports of accidents and injuries during business hours and each place designated as a first aid station.

[*Id.* § 5:3-57(c).]

A plaintiff who fails to report an injury "within 90 days from the time of the accident or incident may be permitted to give the report at any time within one year after the accident or incident at the discretion of a judge of the Superior Court if the operator is not substantially prejudiced thereby." *Id.* § 5:3-58. There is no dispute that Fabricant failed to abide by the explicit timeframes (both the 90-day and 1-year timeframes). Instead, Plaintiffs argue that the 90-day injury reporting signs at Six Flags were not conspicuous as required by the statute. The parties concede that neither the statute nor the relevant regulations define the term "conspicuous." (*See, e.g.*, ECF No. 129 at 10.)

The Court is aware of only two cases that have addressed New Jersey's 90-day reporting requirement: *Lopez v. Gillian's Pier*, 820 A.2d 100 (N.J. Super. App. Div. 2003) and *Doerflein v. Six Flags Great Adventure*, 2006 WL 392980, at *1 (N.J. Super. App. Div. Feb. 22, 2006).[25] In *Lopez*, the plaintiff alleged that he was injured by riding a rollercoaster operated by the defendant. 820 A.2d at 100. Approximately nine months later, a physician issued a letter indicating that the plaintiff's injuries were likely a result of riding the rollercoaster. *Id.* Over a year after riding the rollercoaster, the plaintiff retained legal counsel, but did not file a complaint against the defendant until over two years after riding the rollercoaster. *Id.* at 100-101. After initial discovery was completed, the defendant moved to dismiss the complaint on the grounds that the plaintiffs had

---

[25] The New Jersey Supreme Court's decision in *Steinberg v. Sahara Sam's Oasis*, LLC, 142 A.3d 742, 752 n.11 (N.J. 2016), makes a passing reference to N.J. Stat. Ann. § 5:3-57. However, that case, which involved a catastrophic spinal cord injury at a water park, was centered around different provisions of CARSA and did not address the 90-day injury reporting requirement.

failed to comply with the CARSA notice provisions. *Id.* at 101. The trial court granted the motion and denied plaintiff's motion for reconsideration. *Id.*

The New Jersey Appellate Division affirmed the trial court's decision, finding that it was undisputed that the "plaintiffs did not file a notice within ninety days and never asked for an extension of time to file that notice. In fact, they never filed the required notice at all." *Id.* The Appellate Division further noted that it did not "perceive any constitutional infirmity in the statute itself" because the plaintiff was "alerted to the connection between the roller coaster ride and the injury within sufficient time to give the notice required by the statute but failed to do so." *Id.* at 102.

In *Doerflein*, the plaintiff alleged that he suffered a head injury after riding a rollercoaster at Six Flags. 2006 WL 392980, at *1. The plaintiff claimed that "[h]e was aware that he had been injured as soon as he left the ride and immediately told his wife that he had been hurt. He was not aware at the time of the extent of his injury." *Id.* The plaintiff did not file a notice with Six Flags or anyone else on the day of the incident or at any time prior to filing his complaint approximately five months later. *Id.* A few years later, the trial court granted the defendant's motion for summary judgment. *Id.*

On appeal, the plaintiff argued that "the judge erred in his analysis of the requirements of" CARSA because "the judge erred in failing to find that the complaint itself complied with CARSA's statutory requirement of notice and in rejecting his assertion that the signs posted by Six Flags were not sufficiently conspicuous." *Id.* In particular, the plaintiff claimed "that [the 90-day warning signs] must not have been conspicuous because he stayed at the park for several hours and did not see them." *Id.* at 2. In rejecting the plaintiff's argument, the New Jersey Appellate Division noted that "[t]he evidence of defendant Six Flags' compliance with the number and

placement of the required signs is undisputed."  *Id.*  The Appellate Division also declined the "plaintiff's implicit invitation to adopt a subjective standard for conspicuousness in place of compliance with the statute itself."  *Id.*  As further explained by the panel:

> At the time of plaintiff's visit to the amusement park, it is undisputed that the signs were posted in six locations, including the two main entrances, the main exit, the overflow exit, and two first aid offices. Each sign included an explanation of the reporting requirement under the statute.  *See* N.J.S.A. 5:3–57, –58.  It is also undisputed that the signs had been inspected by representatives of the Department of Community Affairs.  There is, in short, no evidence in the record to suggest that defendant Six Flags failed to comply with the requirement that it post signs that were both conspicuous in place and number so as to satisfy the statutory prerequisite to the reporting requirement.

> [*Id.*]

Although the Appellate Division has not opined on what constitutes "conspicuous" under N.J. Stat. Ann. § 5:3-57(c), *Lopez* and *Doerflein* do provide this Court with some clear guidance. First, like with other statutory reporting requirements, the 90-day and 1-year time limitations in N.J. Stat. Ann. § 5:3-57(c) act as statutes of limitations and must be strictly construed.  *Lopez*, 820 A.2d at 101; *Doerflein*, 2006 WL 392980, at *2-3; *see Pinson v. Perera*, Civ. No. 19-17227, 2020 WL 3542383, at *4-5 (D.N.J. June 30, 2019) (noting that under the New Jersey Tort Claims Act (NJTCA), a plaintiff has ninety days after the accrual of his cause of action to file his pre-suit tort claim against a public entity, and granting motion to dismiss because "[f]ailure to comply with the notice provision may result in a claim being barred"); *see also Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001) (noting that "the 180-day period for filing the administrative complaint and the 90-day period for filing the court action" for a charge of race discrimination under Title VII "are treated as statutes of limitations").  Second, an amusement park operator's compliance with N.J. Stat. Ann. § 5:3-57(c)—not the subjective beliefs of a plaintiff—

is the court's focus when analyzing whether a plaintiff may maintain a claim after failing to provide notice within the limitations period. *See Doerflein*, 2006 WL 392980, at *2.

With guidance from the New Jersey Appellate Division construing its own state law, the Court finds that Plaintiffs' claims for negligence and loss of consortium against Six Flags are time-barred pursuant to N.J. Stat. Ann. § 5:3-57(c). It is undisputed from the record that Fabricant failed to provide any notice to Six Flags. (ECF No. 114-3 ¶¶ 30-31; ECF No. 129-3 ¶¶ 30-31.) Rather, Six Flags first received notice upon the filing of this action almost two years after Fabricant's injury. It is also undisputed that at the time of the incident, the park had six 90-day injury reporting signs in both English and Spanish at the locations required by N.J. Stat. Ann. § 5:3-57(c): two signs at each entrance and exit, one sign at guest relations, and one sign at the first-aid station. (*See* ECF No. 114-21 at 12, 15.) Indeed, Plaintiffs' own expert, Dr. Sugarman, does not dispute that the locations of the signs comply with the statute and regulations. (*See* ECF No. 114-21 at 16 (noting that "the six Injury Reporting Requirement[] signs are placed in the mandated locations and may be noticeable (i.e., can be seen) by a patron who is within several feet of the sign).) Rather, Dr. Sugarman opines that the signs are not conspicuous to a patron when viewed with other signs and other distractions at those locations. (*See id.*)

Based on the undisputed evidence in the record, the Court finds that this case is on point with *Doerflin* where the Appellate Division determined that the posted signs "were both conspicuous in place and number so as to satisfy the statutory prerequisite to the reporting requirement." 2006 WL 392980, at *2. Therefore, because the Court need not consider Fabricant's subjective belief as to whether the 90-day reporting signs were placed "conspicuously," but rather need only consider whether Six Flags complied with the relevant statute and regulations, the Court finds that summary judgment in favor of Six Flags is appropriate.

Further, the Court is unpersuaded by Plaintiffs' assertion that Dr. Sugarman's expert testimony raises a genuine factual dispute as to whether the 90-day injury reporting requirement applies. Regardless of whether Dr. Sugarman's testimony would be admissible, as a matter of law the Appellate Division in *Doerflein* expressly declined to adopt a subjective standard for conspicuousness. *See Doerflein*, 2006 WL 392980, at *2 ("declin[ing] [the] plaintiff's implicit invitation to adopt a subjective standard for conspicuousness in place of compliance with the statute itself"). Indeed, adopting such a standard would essentially render an amusement park's compliance with the statute and accompanying regulations a nullity.[26] Moreover, accepting Plaintiffs' invitation would appear to run afoul of the legislative intent in promulgating this stringent reporting requirement. Finally, as the Appellate Division noted in *Lopez*, any constitutional infirmity is eliminated because Plaintiffs were "alerted to the connection between the roller coaster ride and the injury within sufficient time to give the notice required by the statute but failed to do so." *Lopez*, 820 A.2d at 102.

Therefore, the Court finds that based on the underlying policy behind CARSA and relevant state court decisions, Plaintiffs' claims against Six Flags are barred pursuant to the 90-day injury reporting requirement.

### 2. *Statute of Repose*

Defendants Intamin and Intaride assert that Plaintiffs' claims against them are barred pursuant to New Jersey's statute of repose. (ECF No. 117-2 at 11-16.) Similar to the 90-day injury

---

[26] At the *Daubert* hearing, Plaintiffs' counsel, for the first time, challenged the admissibility of the NJDCA email confirming that Six Flags' signs were in compliance with the controlling regulations, claiming the document was not produced during discovery. The Court need not rule on the admissibility of the email as there is no dispute that Six Flags complied with the regulatory requirements regarding the number and location of the signs. Rather, Plaintiffs contend the signs were not "conspicuous" to Fabricant as that term is used under the statute.

reporting requirement in N.J. Stat. Ann. § 5:3-57, the Court must look to state law for guidance when analyzing whether the statute of repose applies. *See Pub. Serv. Elec. and Gas Co. v. Newport Assocs. Dev. Co.*, 365 F. Supp. 3d 506, 515 (D.N.J. 2019) (noting that district court must interpret New Jersey's statute of repose in accordance with state law).

The statute of repose bars all actions "to recover damages for any deficiency in the design, planning, surveying, supervision or construction of an improvement to real property . . . or for an injury to the person . . . arising out of the defective and unsafe condition of an improvement to real property" brought against the persons performing such services more than ten years after the services are performed. N.J.S.A. § 2A:14-1.1(a). "The basic feature of a statute of repose is the fixed beginning and end to the time period a party has to file a complaint." *Cumberland Cnty Bd. of Chosen Freeholders v. Vitetta Grp., P.C.*, 71 A.3d 235, 241 (N.J. Super. App. Div. 2013). "Unlike a conventional statute of limitations, the statute of repose does not bar a remedy but rather prevents the cause of action from ever arising." *Port Imperial Condo. Ass'n v. K. Hovnanian Port Imperial Urb. Renewal, Inc.*, 17 A.3d 283, 290 (N.J. Super. App. Div. 2011). "For example, the ten-year statute of repose would preclude suit even if the statute of limitations had not run on a claim in which the discovery rule was applied." *Cumberland Cnty Bd. of Chosen Freeholders*, 71 A.3d 235 at 243.

As the New Jersey Supreme Court has recognized, "the statute of repose responded to the expanding liability of contractors, builders, planners, and designers occasioned by the rejection of the 'completed and accepted rule,' the expanding application of the discovery rule, and the evolving development of strict liability in tort for injuries arising from defective conditions in newly constructed buildings." *State of New Jersey v. Perini Corp.*, 113 A.3d 1199, 1208 (N.J. 2015). As a result, "[c]ourts have consistently construed the statute broadly to 'achieve the

legislative goal of providing a reasonable measure of protection against expanding liability for design and construction professionals[.]'" *Cumberland Cnty Bd. of Chosen Freeholders*, 71 A.3d 235 at 242 (quoting *Newark Beth Israel Med. Ctr. v. Gruzen & Partners*, 590 A.2d 1171 (N.J. 1991)); *see Garten v. Intamin Amusement Rides Int. Corp. Est.*, Civ. No. 19-20040, 2020 WL 4745780, at *5 (D.N.J. Aug. 17, 2020) (same). "The primary consideration underlying a statute of repose is fairness to a defendant, the belief that there comes a time when the defendant ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations[.]" *R.A.C. v. P.J.S., Jr.*, 927 A.2d 97, 105 (N.J. 2007) (internal quotations and citations omitted). Therefore, "[b]ecause of the deference owed to a legislative enactment, courts generally do not expand the limitations period defined by a statute of repose unless the Legislature carved out exceptions that permit for tolling." *Cumberland Cnty Bd. of Chosen Freeholders*, 71 A.3d 235 at 242 (quoting *R.A.C.*, 927 A.2d at 97).

In *Dziewiecki v. Bakula*, the New Jersey Supreme Court articulated three factors that must be met before an action is time-barred under the statute of repose: (1) "the injury sustained by [the] plaintiff resulted from a defective and unsafe condition of an improvement to real property"; (2) the defendant was "responsible for performing or furnishing the design, planning, surveying, supervision of construction, or construction of the improvement"; and (3) "the injury occurred more than ten years after the performance or furnishing of the services." 853 A.2d 234, 236 (N.J. 2004). In the wake of *Dziewiecki*, the New Jersey Appellate Division made clear that the statute of repose applies where the improvement to real property "was not a standardized building product, but was specially-designed and fabricated to be an improvement to the real property." *Cherilus v. Fed. Express*, 87 A.3d 269, 277 (N.J. Super Ct. App. Div. 2014). In other words, a litigant "may not invoke the statute of repose if the article [at issue] was merely designed as a standardized

40

product, which happened to be installed in a construction project." *Id.* at 278 (citing *Dziewiecki*, 853 A.2d 234; *Perini Corp.*, 39 A.3d 918).

It is undisputed that Intamin and Intaride were "responsible for performing or furnishing the design, planning, surveying, supervision of construction, [and] construction of" Kingda Ka, (*see* ECF No. 117-1 ¶ 2; ECF No. 130-3 ¶ 2), and that Kingda Ka opened in 2005, (ECF No. 117-1 ¶ 3; ECF No. 130-3 ¶ 3). Therefore, the Court finds that the second and third factors have been met.

It is also undisputed that the Kingda Ka rollercoaster, as a whole, is a land improvement. (*See* ECF No. 130 at 7 ("Defendants argue that Plaintiff's products-liability claims are barred by the ten-year New Jersey statute of repose[] . . . for buildings and land improvements, because (they argue) the seats and harnesses of which Plaintiffs complain are 'essential to the function' of the Kingda Ka roller coaster [] -- which Plaintiffs do not dispute is a land improvement -- and therefore are themselves land improvements").) Plaintiffs' argument as to why the statute of repose does not apply, however, is based on "the seats and rider restraints in Kingda Ka, not the roller coaster as a whole." (*Id.* at 9.) In other words, Plaintiffs assert that Kingda Ka's seats and harnesses (*i.e.*, the alleged defective and unsafe condition that caused Fabricant's injuries) do not constitute "improvements to real property" within the meaning of the statute of repose. *See also Garten*, 2020 WL 4745780, at *6 (noting that "the Kingda Ka Roller Coaster . . . can be viewed as an 'improvement to real property,' whereas if the seats and harness devices" that are at issue in this case "are 'standardized' or 'mass-produced,'" they would not fall within the statute of repose). Plaintiffs' theory of liability stems from *Dziewiecki*, in which the New Jersey Supreme Court held that:

> when a person in effect wears 'two hats' (undertakes activities covered by the [statute of repose] and comes under the product liability statute), and the cause of the injury is attributable to both, the responsibility should be allocated between the two. That portion of the liability that relates to activities that fall within the [statute of repose] would not after ten years be actionable, and that portion of the liability that derives from a product liability cause of action would be covered by the limitations period set forth in N.J.S.A. 2A:14-22.

[853 A.2d at 237.]

In support of their position that the statute of repose does apply, and therefore bars Plaintiffs' claims, Intamin and Intaride rely on *Tafaro v. Six Flags Great Adventure, LLC*, Civ. No. 17-5607 (D.N.J. Mar. 26, 2019) (ECF No. 48 at 1-7). In *Tafaro*, the plaintiff alleged that the defendants (also Intamin and Intaride) "'manufactured, designed, distributed, and sold' the El Toro rollercoaster ride ('El Toro'), located on the premises of Six Flags' Great Adventure theme park in Jackson, New Jersey," and that the plaintiff "was injured while riding in El Toro, which 'was defectively designed in that the design of its interior compartment and seating did not protect the patron from being thrown about inside the car while on the ride.'" *Id.* at 2. In finding that the statute of repose did apply, the court in *Tafaro* determined that rollercoasters are "improvement[s] to real property" because they "certainly increase the value and enhance the use of amusement parks given that they are central to the park's business: they attract guests, including G.T., to attend the park and pay an admission fee." *Id.* at 4-5. Moreover, "the installation of El Toro, a unique, non-standardized structure, was more than a mere repair or replacement," and, "[i]n fact, the [second amended complaint] confirms the unique nature of the roller coaster, noting that, when it opened, El Toro had the steepest drop, the fourth highest height, the second highest drop height, and fourth highest top speed of any wooden roller coaster in the world." *Id.* at 5. "El Toro is, therefore a massive, unique, permanent structure, and is neither easily removable nor 'standard

42

building material or a "stock or shelf" fabricated item,' which earns protection under the statue of repose." *Id.*

Most importantly, the court in *Tafaro* rejected the plaintiff's argument "that even if the roller coaster is an improvement to real property, the parts of the roller coaster that caused [the plaintiff's] injury—the head cushioning and the seat design in the interior compartment of the roller coaster—are not." *Id.* at 5 n.3. Citing to *Dziewiecki*, the case the plaintiff relied on in support of such an argument, the court concluded that it did not stand "for the proposition that the statute of repose permits the separation of the component parts of a structure from the structure itself." *Id.* Rather, *Dziewiecki* "merely held that an installer of an in-ground swimming pool was protected by the statute of repose, but the designer of the mass-produced 'pool kit,' which provided the component parts for the pool, was not, because 'manufacturers and suppliers of standardized items were [not] intended to be covered by the [statute of repose].'" *Id.* Conversely, "the El Toro roller coaster is not such a 'standardized' or 'mass-produced' item, but rather, is a unique structure, designed specifically for Six Flags." *Id.*

Like the Court in *Tafaro*, the Court here finds that the statute of repose applies because the seats and rider restraints of Kingda Ka fall within the scope of "improvements to real property." First, Kingda Ka, like El Toro, was known for its unique, non-standardized structure. Indeed, it is clear from the record that Kingda Ka was the "tallest and fastest" steel rollercoaster in the world, reaching a speed of approximately 128 miles per hour in about 3.5 seconds. (*See* ECF No. 32 ¶ 17; ECF No. 115-2 ¶ 4.) Therefore, Kingda Ka was clearly "a massive, unique, permanent structure, and [was] neither easily removable nor standard building material or a stock or shelf fabricated item, which earns protection under the statue of repose." *Tafaro*, ECF No. 48 at 5 n.3.

43

Second, Kernacs, an engineer and the president of Intamin, testified at his deposition that Six Flags commissioned Intamin to design the Kingda Ka rollercoaster for the theme park in Jackson, New Jersey. (ECF No. 117-1 ¶ 2; ECF No. 130-3 ¶ 2.) Per Kernacs, Intamin custom designs each rollercoaster "according to the customer's wishes." (ECF No. 117-1 ¶ 6; ECF No. 130-3 ¶ 6.) Kingda Ka's design utilized a complex restraint system comprising many parts, manufactured by different companies. (ECF No. 117-1 ¶ 7; ECF No. 130-3 ¶ 7.) As articulated in his deposition, Kernacs testified that Intamin and Intaride "do not have a standard seat and we do not . . . have a seat that we can put in on any roller coaster. All of them are custom. Sometimes you have major differences, sometimes minor differences but maybe just a few inches in difference." (ECF No. 117-4 at 32.) Moreover, Kernacs visited Six Flags, inspected the location of where Kingda Ka would be built, and oversaw the creation of a "custom design" for the rollercoaster. (ECF No. 117-1 ¶¶ 4-5; ECF No. 130-3 ¶¶ 4-5.) Based on the evidence in the record, the Court finds that the seats and rider restraints of Kingda Ka fall within the statute of repose because they are custom to the rollercoaster, and therefore an integral structural component essential for operation. *See Silver v. Westinghouse Elec. Corp.*, Civ. No. 04-816, 2006 WL 2385073, at *4 (D.N.J. Aug. 16, 2006) (finding that New Jersey's statute of repose barred the plaintiff's claims because the metal clad switchgear assembly, the component part at issue, was designed to be a permanent part of the substation and were essential to the function of the substation); *Rolnick v. Gilson & Sons, Inc.*, 617 A.2d 288, 291 (N.J. Super. Ct. App. Div. 1992) (noting that the statute of repose applies in situations where a "defect [is] an integral structural component of a basic system, not in a mass-produced, mass-marketed appliance unessential to the functioning of such a system").

Plaintiff attempts to discredit Kernac's testimony and create a genuine issue of material fact to survive summary judgment by offering the testimony of Pribonic as set forth in his July 15, 2019 declaration.   However, as previously discussed, Pribonic's testimony in this regard is inadmissible for failure to meet the *Daubert* standard.

Therefore, the Court finds that in applying the elements broadly to achieve the Legislature's clear goal in enacting the statute of repose, Plaintiffs' claims against Intamin and Intaride are time-barred because Kingda Ka—including the seats and restraints at issue here—was a unique structure, designed specifically for Six Flags.

## IV.   CONCLUSION

For the reasons set forth above, and for other good cause shown, Defendants' Motions to Exclude Plaintiffs' Experts (ECF Nos. 114, 118, 119) are **GRANTED in part** and **DENIED in part**.[27]  Defendants' Motions for Summary Judgment (ECF Nos. 114 & 117) are **GRANTED**. Plaintiffs' Motion for Partial Summary Judgment (ECF No. 115) is **DENIED**.[28]  An appropriate Order follows.

Dated: July  2  , 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[27]     Because the Court need not rule on the admissibility of Dr. Sugarman or Colonel Smith, Defendants' Motions as to those experts are denied as moot.

[28]     Because the Court finds that the 90-day injury reporting requirement and the statute of repose apply, Plaintiffs' Motion for Partial Summary Judgment must be denied.